## Myers Bros. v. Hager.
(Decided Nov. 4, 1936.)

**4**

WOODWARD, DAWSON & HOBSON for appellant.

CLIFFORD E. SMITH for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

In October, 1932, Myers Brothers, a partnership, of Campbellsburg, Ind., and Arch Hager, Nicholasville, Ky., entered into a written contract by the terms of which Hager agreed to crush and deliver into a bin approximately 2,700 cubic yards of crushed limestone, meeting the 1932 State Highway specifications for coarse aggregate, for which Myers Brothers agreed to pay him $1.50 per cubic yard. Myers Brothers further agreed to pay him $1.75 per cubic yard for any fine aggregate in the bin, meeting the specifications for class A concrete, "the fine aggregate to the approximately seven hundred [700] yards." The parties to the contract agreed that Myers Brothers were to pay these prices every thirty days to D. L. Walker & Co., Lexington, Ky.

At the time this contract was entered into, Hager's crushing machinery was in Barren county, Ky., and the rock to be crushed was to be used in Pulaski county, Ky., which necessitated the moving of his machinery to Pulaski county.

The fine aggregate mentioned in the contract was a

by-product of the manufacturing of the coarse aggregate; that is, as the coarse aggregate was manufactured, the fine aggregate was produced by the operation of the machinery. The latter was separated by the use of a special section of a sieve or screen attached to the machinery and operated as the coarse aggregate was manufactured. There was no additional cost to Hager in the crushing of the coarse aggregate, to produce the fine aggregate, except the cost of the screen or sieve that was put in for that purpose, and the cost of piling it to itself at the plant.

After Hager's machinery had been operated a few days, the resident engineer of the State Highway Department made a field test of the fine aggregate when he determined it did not check with the standard specifications of the 1932 State Highway Department for class A concrete. Of this fact he advised Hager's foreman on the job. About the date of his field test, the federal engineer informed the parties concerned that "the federal requirements that had just been passed out to them would prohibit the use of limestone screening on a federal job, and for that reason, could not use any more" limestone screening. Thereafter, the use of limestone screening—the fine aggregate mentioned in Myers Brothers and Hager's contract—was discontinued. This fact did not relieve Myers Brothers and Hager of their contract.

When Hager began to manufacture the coarse and fine aggregate, a Mr. Cheek, the foreman of Myers Brothers, directed the foreman of Hager to separate the fine aggregate and "dump it into stock piles" to itself, "about fifty yards from the plant," which was accordingly done as it was manufactured. Thereafter, Cheek, for Myers Brothers, hauled part of it away.

After the resident engineer imparted to the foreman of Hager that according to his field test, the fine aggregate would not meet the requirements of the 1932 specifications of the highway department, Hager detached the sieve or screen that was being used at that time to separate the fine aggregate, removed it, and secured another that would comply with the field test of the resident engineer as the information thereof was given to Hager's foreman. Thereafter, it was used until the manufacture of the coarse aggregate was com-

pleted and the fine aggregate now in controversy was manufactured, separated, and piled at the plant according to the directions of the foreman of Myers Brothers given at the commencement of the manufacture of the coarse aggregate.

After a portion of the fine aggregate was hauled away, no one for Myers Brothers gave any more attention to the manufacture of the fine aggregate. No laboratory test was made and no one for Myers Brothers made any objection to the fine aggregate on any ground or for any cause.

Before the whole of the contract quantity of the coarse aggregate was manufactured, Myers Brothers discovered they would not need the 2,700 cubic yards, the quantity called for in the contract. They so informed Hager, and agreed to pay Hager, and did pay him, $100 to release them from the contract calling for the balance of the 2,700 cubic yards. It is not disputed that Hager was not paid for the fine aggregate, though he was paid for the coarse.

It is adequately established that Hager had no contractual or other relation with the highway department, and manifestly his and Myers Brothers' contract, though not so stating, contemplated that the obligation was upon Myers Brothers to have ascertained and determined by the proper employees of the highway department whether either the coarse or the fine aggregate did or would meet the requirements of the 1932 specifications of the highway department.

It is fairly shown that the necessary and required test of it could not be made in the field or at the plant by the local engineer. Nor could its quality and sufficiency be determined from, or by, his casual examination of it.

It is established that it was the duty of the resident engineer, either on his own accord or at the instance of the contractors, to cause to be made at the laboratory of the highway department "a graduated test" of the fine aggregate. Hager, as it appears from the evidence, was not privileged to call for, or require, a test to be made by the highway department or any of its employees. It is shown that a test made in the field by the resident engineer is regarded by the department merely as a guide, which, of course, was known to the contractors.

The field test was regarded by the department as an inspection of the method of manufacturing, rather than a test of the material. The laboratory of the highway department was the authority to determine whether the fine aggregate did or did not meet the specifications.

"The sole defense to this suit was that the fine aggregate did not meet the specifications for class A concrete." On the evidence adduced the court rendered a judgment in favor of Hager for $1,078.88, plus interest. From this judgment Myers Brothers have appealed, insisting that the court's finding of facts is "erroneous"; that the contract is separable; that the judgment is based on surmise and conjecture; and the court's finding that Hager had "fully complied with the terms, covenants and provisions of said contract * * * and did crush and furnish in accordance with said contract 616½ cubic yards of fine aggregate, meeting the requirements specified in said contract," is erroneous.

Much time and space is used by Myers Brothers in their brief to sustain especially its argument that the court erroneously found the contract to be "inseparable." They correctly argue that "the text-writers and authorities agreed that in determining whether a contract shall be treated as severable or as an entirety the intention of the parties will control, and this intention must be determined by a fair construction of the terms and provisions of the contract itself"; and "where the plain language of the contract did not force a contrary construction, the contract has been held severable in order that the intention of the parties might be carried out as far as possible." The parties do not disagree as to these rules of construction. They only differ in their applicability to the facts adduced.

As we view the case, it is unnecessary to decide whether the contract as it concerns the coarse aggregate and the fine aggregate is separable or "inseparable." However, considering the fact that Hager's machinery was located in Barren county at the time the contract was entered into, and the rock was to be crushed and furnished in Pulaski county for road purposes, and the further fact that Myers Brothers' contract called for the crushing, furnishing, and using both coarse and fine aggregate, the reasonable presumption is that neither party would have entered into the con-

tract covering the coarse, without the provision pertaining to the fine aggregate. It is apparent that the contract price of the coarse aggregate with the provision for the fine aggregate would not have justified Hager to remove his machinery so great a distance merely to manufacture the coarse aggregate. It is equally as apparent that Myers Brothers would not have entered into the contract with Hager without its provision requiring him to produce the fine aggregate. And it is manifest that the parties to the contract did not intend for Hager to manufacture the coarse aggregate and throw away this by-product which the parties agreed in the contract was of the commercial value of $1.75 per ton.

In construing their contract we must look to and consider all of its language, as well as the subject-matter with which it deals, in the light of the circumstances accompanying the parties at its execution. It is our duty so to construe it as to give it such effect, and none other, as the parties to it intended at the time it was made. To this extent only was the parol evidence admissible. Lincoln National Life Ins. Co. v. Means, 264 Ky. 566, 95 S. W. (2d) 264, and cases cited.

When so construed, it is patent that it was the intention of Hager and Myers Brothers that the provisions of the contract respecting the coarse aggregate was not separable from that portion of it relating to the fine aggregate in the sense in which the subject of "separable provisions of contracts" is discussed in the authorities cited to us by Myers Brothers' brief.

It is satisfactorily established that after the resident engineer informed Hager's foreman of the result of his field test and suggested that a different sieve or screen be secured and used for the manufacture of the fine aggregate; that he secured a different sieve or screen, attached and used the same until he produced the quantity of the coarse aggregate desired by Myers Brothers; and as a by-product of its production, manufactured the fine aggregate, placing it in piles at the plant as first directed by the foreman of Myers Brothers until 616½ cubic yards were manufactured, and did so without complaint or objection of Myers Brothers or their foreman, and with the latter's knowledge, and thereby substantially fulfilled his contract.

Myers Brothers argue vigorously that the evidence showing that the fine aggregate met the highway department's 1932 specifications is so vague and uncertain that it is no more than a supposition or conjecture that it met the specifications. It should be apparent we do not so view the evidence.

If the fine aggregate as manufactured by him did not test to meet the requirements of the 1932 specifications, the fault was not Hager's. It was manufactured by the use of the sieve or screen determined proper and necessary by the resident engineer, and piled out for them as directed by their foreman in charge. They hauled away a portion of it and used it. It was within their power to have the highway department to make the laboratory tests if they then desired it. It is too late to refuse to accept and pay for it. It is patent that the prime reason of Myers Brothers not hauling away and using the balance of the fine aggregate is the federal road department adopted different specifications for the construction of federal projects of which the road to be constructed by Myers Brothers under their contract was a part, forbidding the use of fine aggregate of the type called for in the contract.

It is apparent that it is our view the trial court properly decreed in favor of Hager.

Wherefore, the judgment is affirmed.